I'm sure I will not do justice to the name. I should know you by now, counsel. Yes, Judge. Please help me. Go ahead. Iwanige. Iwanige. Yes, Judge. Good morning. Good morning, Your Honor. Yes. Good morning, Judge Gregory. Good morning, Judge Floyd. Good morning, Judge Davis. I appear on behalf of Mr. Adetokunbo Adepoju in reference to a conviction, in this case, flown from Maryland. This is one of those cases where you take a look at the facts and then you take a look at the case law and you start to question the elements of the offense, whether they were satisfied for the purposes to sustain a conviction. As I cited in my brief, specifically, I rely on the Celestia case. This is one instance where Adepoju is charged with bank fraud. Part of the bank fraud allegations entail that he had talked to some individual. As the facts play out, they spoke he was supposed to provide this individual who is a confidential informant some documentation. It was never provided. It was supposed to have given him a photograph for Mr. Adepoju to produce an identification for him. That was never produced. And then subsequently, there was a supposed check of one was 70-something thousand and one was for 20-something thousand. Allegedly, at least as the jury found by way of conviction, that Mr. Adepoju then gave this information or the checks to this individual. And then there was information about an individual or company known as TA. The government thereafter charged him with bank fraud. The allegations are in bank fraud that he, Mr. Adepoju, defrauded a financial institution. As we argue in the Celestia case, specifically, the way that the indictment reads seems to indicate there was some fraudulent misrepresentation made by Mr. Adepoju. Mr. Adepoju never went to the bank. Mr. Adepoju never did anything that misrepresented or misled a financial institution for him to be found guilty of bank fraud. The best evidence that the government has are these checks that were never deposited at any institution. And then secondly, with respect to the identification document, which is the one that alleges information given about TA, the government alleges in the 1028 A that this is an individual that exists. Under the Flores-Figueroa case, the government has to prove beyond a reasonable doubt that Mr. Adepoju knew specifically that the TA, information contained in that TA, is that of an existing person. The record is devoid of any information that imputes that knowledge to Mr. Adepoju that he knew that TA was an existing entity or person. So for him to be convicted of the 1028 A, the Flores-Figueroa case specifically sets out that proof that is required by the government. And I submit that the government, based on the record before Your Honor, and based on the record before the jury, that he could not be held liable, criminally speaking, for the 1028 A capital violation. The government argues in its brief that they established the elements of the bank fraud that, even assuming that he's not charged with count two, that the way that the indictment reads, alleges a violation of a scheme or artifice. But then if you look at the indictment, and then look at the facts in support of the indictment, it's putting the cat before the horse. There is no misrepresentation. There is no scheme whereby a financial institution was misrepresented to, lied to, a scheme to defraud the financial institution. What you have is the individual saying that I opened an account. But then this was prior to him even receiving any documentation or check from Mr. Adepoju. And then the other additional fact is where this individual claims that the money is in the bank and then the money is going to be withdrawn on a certain date, but there's nothing that was specifically done by Mr. Adepoju for the purposes of establishing the elements that are required for a 1344 violation, which is the bank fraud violation. Additionally, as well, assuming that the conviction were to stand, which, of course, we disagree with, Judge. Your Honor, the sophisticated means, as Judge Hilton found in one case, there's nothing about a case or there's nothing about any fraud that is really sophisticated. In other words, Judge, if I take out a checkbook and I write my name on it and then I deposit it into the bank, knowing that I don't have funds, that's not bank fraud. But then that intent that I knew at the time I deposited the check that I didn't have the money obviously means that I'm trying to defraud the bank because the bank is now relying on that representation that I made with that specific intent, knowing that I didn't have money, to now get money that was supposed to be held in trust by the financial institution. But if you translate the example that I used, Your Honor, to the specific case that is before you, Mr. Adepoju never went to the bank, never made any mass representations to the bank, never devised a scheme or artifice for the purposes of defrauding a financial institution as defined in the code and as defined in the law. So based on those reasons – What role do you think the fraudulent checks played, even though notwithstanding, as you said, he didn't go there, he didn't sign anything? What role did that play in the scheme as the government presented it? I will say that the checks themselves may be, I will say, preparation, not even an attempt. It may be preparation towards committing a bank fraud that may not be fully an attempt. Because, Your Honor, if I print out a check and then give it to an individual, if that individual never makes it to the bank to deposit that check or an attempt to deposit that check, then you don't have an attempted crime. What you have, I will submit based on the substantial step test that we cited in our brief, what you have is basically an individual still preparing towards committing a crime. It is when you attempt to deposit it, like in the Celestia case, there were deposits made. Why can't a step in preparation also be a substantial step toward commission? Yes, there could be some steps that may be substantial, but I submit that once the step itself becomes substantial, then it will then translate to the point where you're actually then attempting to commit a crime. So in other words, the substantial test, once you move from the preparation to the point where the step is now substantial, it becomes a gray area whether you're still preparing or whether you're now attempting to actually commit the crime. So I'm not sure I see the line quite as clearly as you do. Yeah. Judge Davis, I believe that one may take substantial step towards trying to complete a crime or attempt to complete a crime, but in substantial nature of it, I mean, it's going to be something based on a fact to, I mean, on a case-to-case basis. Specifically in this one, if you print out checks and then hand to an individual, if the individual is holding on to the checks, the step is not yet substantial until... That's not a substantial step towards the scheme? I would say that because the conversation involved the production of a false identification, that there has to be that production of the false identification that will then lead to the deposit being made, that that will make it substantial. But then the printing of the checks are submitted to the court may technically get close to being substantial, but then because in this case you need a false ID to be able to deposit a check made out to TA into Wells Fargo, that it's still part of the preparation whereby you've produced the checks, but then you still need the identification to then move to the substantial step whereby you're now attempting to deposit the check, which would now make out the elements that you need under 1344, whereby it talks about even an attempt. So your position is that the defendant didn't put everything in the hands of the intermediary to complete the crime? Based on the evidence that was produced at trial, I believe the cooperator said that the checks were given to him. What else did he need? He needed an identification because an identification has to be done with the name TA. What I'm saying, your argument is that he hadn't placed that in his hands, the check is one part, the next part is the identification. Maybe I misspoke, Judge Gregory. What I meant was that one of the steps, there are two steps needed to move from preparation into an attempt for the purpose of the scheme alleged by the government. One is the production of the checks, and then two is the production of the identification in the false name of TA for the purposes of depositing the checks. But then only one part was done. The second part wasn't done, and that deposit cannot be made without the identification of TA, whose name appears to be on the checks. So my argument, Judge Gregory, is that you need those two things at least for you to move from the preparation stage. Because assume for one minute that he didn't give him checks first, but then give him the identification or the information with the name TA, and then the supposed TIN number. That's not enough for you to move to the next level, which is the purpose of committing the bank fraud because you still need the checks. We have a case called United States v. Pratt that says something to the effect punish it for attempt conduct that puts in motion that would, from the defendant's point of view, result in the commission of a crime but for an intervening circumstance. When he gave him the check and said go, in his mind, doesn't he think the scheme is going down? It's quite possible you can read it that way, Judge Floyd, but then the problem is, as I understood the scheme when I tried this case, an identification was also necessary to effectuate the depositing of a check. In other words, the check itself does not by itself complete or at least get you to the level of attempt. But I do understand where the court can see a situation whereby just because the check is printed out that that's, in the defendant's mind, enough for him to move from mere preparation into an attempt, as the Pratt case distinguishes. But I will submit to your Honor that you have to look at the case in the totality of the circumstances of this particular case and the totality of the circumstances of this particular allegation and this fraud alleged by the government is that the checks were to be produced and then identification was needed for the purpose of effectuating the fraud that was called for in this case. With respect to sophisticated means, I will submit to this court that that enhancement is inapplicable under the facts of this case. There is nothing about printing a check that individuals do these days at Kinko's or anywhere. This court has seen numerous cases on appeal whereby an individual is charged with bank fraud or something doing fraud. When you talk about sophisticated means, there has to be something sophisticated about something that is being done. Printing out checks and then trying to deposit printed out checks that may be fraudulent, there's nothing sophisticated about it. In other words, that pretty much means that any fraud activity is sophisticated the way that the court interpreted it, the district court interpreted it, but there has to be some indicia of some sophistication because the English definition of the word sophistication means something that is not getting variety. But in this case, I'll submit to this court that I do not see anything in the fraud activity alleged by the government here that requires a two-level enhancement for sophisticated means. So at the very least, on behalf of Mr. Adepoju, I ask that the court find that the evidence in this case was not sufficient for him to be found guilty of the charges of bank fraud and the aggravated identity fraud. And then if this court is to affirm this conviction, that I ask that the case be remanded because I will submit to this court that there's nothing sophisticated about what was alleged in here for him to get a two-level enhancement for purposes of sophistication. Thank you, Your Honor. Thank you. Good morning. May it please the court. Judson Myhock on behalf of the FLE, the United States of America. In this case, the defendant did everything that he was required to do in the bank fraud scheme that the defendant had developed. We have a situation where the defendant started the conversation with the confidential source by asking him if he knew anyone who worked at a bank. And the fraud scheme evolved from there. The confidential source, with instructions from the agent that he'd been working with, indicated that he did know somebody who worked at a bank, specifically a Bank of America. The defendant's fraud scheme involved that person, the confidential source, using his contact who worked inside the bank and providing that individual information for the purpose of opening both a personal account and a business account, depositing these fraudulent checks into those accounts, and then withdrawing whatever funds they were able to withdraw before the fraud scheme was detected. Toward the end of accomplishing this scheme to defraud, after having multiple discussions with the confidential source about the plan, the fraud scheme did evolve over time. Initially, the defendant indicated that he needed a picture of the confidential source to put on fabricated identification documents for proof or to help support the opening of the account. But then the defendant changed his mind and said, well, since the source had somebody who worked at the bank, that that part wasn't necessary. So then the next part of the scheme was just the defendant providing the information of the victim TA to the source so that the source could then open the account. There was no further identification documents, nothing else that was necessary, because as the confidential source testified at trial, this was an inside job. He knew somebody who worked at the bank who would open the account. And the defendant did, in fact, provide all of the information that was necessary in order to do that. On August 31, 2010, the defendant provided to the confidential source who was working at that gas station the name of TA, a date of birth, which is TA's date of birth, Social Security number, which was TA's Social Security number. There was also an address listed in Maryland. That turned out not to be true, as well as a Maryland driver's license number, which was also not true. Importantly, this information was handwritten on the back of an official Internal Revenue Service employee identification number that had been issued in favor of a company called TA Trucking. That information, that TA Trucking EIN, came from somebody using TA, the victim's name, and Social Security number, and using those two pieces of information in combination to officially file and actually get an employee identification number in support of this fictitious company, TA Trucking. And the scheme was that the confidential source was going to use those two pieces of information to open a personal account at Bank of America in the name of TA and a business account at Bank of America in the name of TA Trucking. Thereafter, after providing that information to the source on August 31, 2010, which was all that was needed under this scheme to open that bank account, the defendant is pressuring the confidential source. He wants proof. He wants to know that that account has been opened. And the defendant is also calling Bank of America and finding out that they're not listing an account. There was no account under the name TA or TA Trucking, which raised the defendant's concerns. The defendant then confronts the confidential source, which then required Agent Apollo to go to the Bank of America fraud section and have them fabricate checks that looked like they were both for a personal account and a business account so that the confidential source could show those to the defendant, both to give the confidential source a little space and a little breathing room, but also give the agents the opportunity they needed to start to plan and game plan the taking down of this fraud. So there was no account open? There was no account ever open. That's correct. And the government had what a shell-type... I mean, you opened up what looked like an account that really wasn't open. That's correct, Your Honor. No account was ever opened. That's what I was trying to get to. I thought you were telling us what they had actually done. You put out the scheme, but what did they do in terms of further? They didn't open it up. They didn't open the account? Well, remember, that was the confidential source's part of the fraud scheme. So in looking at what the defendant thought was required of him, not only is the defendant doing everything that's required of him, but he's pressuring and putting pressure on the confidential source to do his part. He's calling the bank to find out if those accounts have been opened. He delivers the first of those checks, the $28,000 check made out to T.A. on September 23, 2010, and the second check made out to T.A. Trucking on September 27, 2010. That check was for $70,500. What point did the confidential source become your agent? What date? Well, I would say from the very beginning. Exactly. From the very beginning, he was acting as your agent. Correct. Yes. All right. And you said it's part of a scheme, an agreement with whom? Your agent was in agreement with whom? Well, if things were as he thought they were. But in fact, it was your agent, and you're saying your agent was in agreement with whom? With the defendant? Well, with the defendant, yes. Oh, okay. All right. Well, the defendant was everything. The defendant was the one who came up with the scheme. He was the one who developed the scheme. He was the one who provided the name T.A. with the information that would be necessary to open up the account, and he was the one who provided both forged checks, both Wells Fargo cashier's checks, that were made out to the favor of or in favor of T.A. And he printed those on his computer at home, basically? Well, those checks, and they were high-quality. They were high-quality forgeries. Which he created, the defendant created? Well, we don't know. Or you don't know? We don't know for sure. He was the source of those checks. We know from the search warrant that was done on October 13, 2010, he had the thumb drive that was recovered from some clothing in the master bedroom. That's where we found the Social Security card template, as well as various other financial instruments, checks that were written out to different companies, BEI, SS, SMM, and Alamo restaurant that were in the process of being washed. You could see where they had been scanned in and an effort had been made to remove both the payee and the amount of that check. That was in addition to other printed-out information, other checks that were obviously already forged. The one was the Cambridge at the Preserve with his wife's name on it, and then there were other versions of that check that were printed out where the payee and the amount had been removed. So there was substantial other information that this was part of a larger check forgery operation, but we didn't have any direct evidence that the defendant had been. We didn't find images of those specific Wells Fargo cashier's checks when we did the search warrant. With regard to the sophisticated means enhancement, actually if I could just turn back, the Celestia case, which in fact District Court Judge Garbus was sitting by designation when that case was decided, really isn't on point here. The Celestia case involved a simple check-kiting situation. This construction company was writing checks between their accounts and overdrew to the tune of about $600,000. That's not this case. This case is more along the lines of the Brandon case. In the Celestia case, however, based on those facts, based on that check-kiting scheme that was happening in that case, this Court decided that that could constitute 1344-1. But the Brandon case is really a case that's closer to the facts of this case that involved stolen checks, fabricated identification documents, and then passing those stolen checks at various retail establishments. The question was whether or not that could constitute 1344-1 because where's the loss to the bank? They were presenting these checks at retail establishments, at various merchants, and this Court found that that could constitute 1344-1 and, in fact, went on to affirm that conviction. This Court didn't have to reach whether that could also constitute 1344-2 in that there were false or fraudulent misrepresentations, but I submit that we have that in this case as well because, as this Court said without deciding, the mere forged signature on a check could constitute a fraudulent misrepresentation, and clearly in this case we had the Wells Fargo cashier's checks that the defendant provided to the source which were completely fabricated. So as in the Brandon case, this case, the indictment and the jury was instructed on 1344-1, 1344-2, as well as an attempt, and the Court could affirm on any of those grounds, but I submit that we did prove under 1344-1 that there was a scheme to defraud a financial institution and we did prove that there was loss. Both Wells Fargo and Bank of America indicated that if this had been successful, those financial institutions would have suffered a loss. On sophisticated means, District Court Judge Garbus limited his finding to the facts and circumstances that surrounded just the conviction, the offenses of conviction. In the mix, Judge Garbus included the fact that T.A., the victim who had testified in this case, that there had been no obvious point of compromise. It's not that at some point a check he had mailed went missing and a credit card company or the mortgage holder somewhere was saying that they never received payment. In addition, the fabricating of those two Wells Fargo cashier's checks, the providing of the information, date of birth, Social Security number of the victim, in this case T.A., all of those things Judge Garbus credited in arriving at his conclusion that this did constitute sophisticated means. Could you explain that a little better or elaborate a little bit? Yes, Your Honor. What was sophisticated? Well, in this case, not only what Judge Garbus found was that getting the date of birth and the Social Security number of the victim in this case, that's not something that an ordinary person would know how to do, and in this case there was no obvious point of compromise. So that was something that he credited. When you say obvious point of compromise, you mean? When the victim testified at trial, he said, you know, I never got a late payment notice. I never heard. Why does that translate into a sophistication? Well, I think it's less sophisticated. Well, I think it's less sophisticated if you see the flag up on somebody's mailbox and you go in there and you grab their mail and you're able to discern what their name, date of birth is. Yes. So if absent that, absent evidence that it happened that way, Judge Garbus was. . . See, that's what I'm struggling with. As you just said, absent evidence that it happened in a nonsophisticated way, then that's a sufficient basis for an inference that it must have been sophisticated. Right, and that was just one component. Okay. But that was just one piece of the puzzle that we developed. What else is there? In other words, what we have here is an absence of evidence. Well, as to that point. Okay. But clearly taking the information, the name T.A. and the Social Security number, going to the IRS and getting an official employee identification number issued in the name of T.A. Trucking so that that would support the opening of the business account, creating this fictitious entity for the purpose of furthering that fraud scheme. Now, when you say going to the IRS, that means just filling out an application, right? Right. You're going online with that information. They can do it online to get it. Yeah. So, again, my question, where's the sophistication? Right. Well, I think the totality, right? Well, I think that puts it in a . . . You're making it sound pretty easy, unfortunately. I don't mean that as criticism, but in our wired world, it doesn't take a lot of sophistication to get that kind of information. Well, in addition to that information, which is what Judge Garbus based his decision on, and I submit that that's his finding or his conclusion there wasn't clearly erroneous, in addition to that, the evidence at trial supported from the evidence we got from the search warrant that the defendant had that thumb drive with the blank Social Security template. And he didn't rely on that. Judge Garbus did not. But in your brief, you say we should consider that kind of information. Yes, Your Honor. In addition to all the checks that were in various stages of being written over, in addition we had that same information, the name TA with the Social Security number, date of birth, same address being used to open five accounts at banks right around where the defendant lived in this same time frame, July and August of 2010. And any time that there was any transaction at a brick-and-mortar location, again, this was happening close to where the defendant lived, nominal deposits going into the accounts, ordering checks, all those things happening right in the vicinity of where the defendant lived. And if we look at the Okolo case, O-K-O-L-O, in that case, Judge Williams found that the simple act in support of a loan application which involved fraud, having an ADP, what appeared to be a pay stub from ADP, which included information not only about income but fabricated information about tax withholdings and dental and vision insurance premiums that were paid out, that that fact alone, despite the fact, as the defendant pointed out in that case, that the information on that ADP pay stub conflicted with the employee verification letter that was submitted. But despite that, Judge Williams found that that did involve sophisticated means, and this Court found that that was not clearly erroneous. I think here we have more than that in this case, given the two forged Wells Fargo cashier's checks, those two forged instruments, the employee identification number, the information of the victim T.A., in addition to all the items that were found from the search warrant. With regard to the aggravated identity theft conviction, the record was clear that the confidential source asked the defendant if this was a real person. And the backdrop to that was Agent Apollo knew, obviously, this was important to establish. He's providing this information, T.A., with the date of birth and Social Security number, and for the 1028A that we were looking to charge eventually, we needed to know that the defendant knew that this was a real person. And so that's imparted to the source, and then the source has that direct conversation with the defendant. And there's no equivocation. Every time in the record where... Is that on the wire, by the way? That explicit conversation was not. Was not. Right. But there was testimony. There was testimony that he asked him that question directly, and the defendant answered that directly. And when pushed, pulled, and, you know, he was clear. He never equivocated that he had that conversation, and the defendant told him it was not a fake. And there were several references in the reported conversations after that made it clear. The defendant knew what was on that paperwork that he provided. There's several references to Mr. A, T.A., this trucking company. So clearly he knew. And there is one conversation that came later where that was recorded where he's saying, no, no, you know, where he says, no, no, no, it's not a fake. Again, as we conceded at trial, these were not recording studio quality recordings. Unfortunately, they're at a gas station. It's at a busy intersection. Sometimes they were outside dealing with the wind. The confidential source has a French accent. Frequently as somebody committing a fraud scheme or a crime, like the defendant, he was whispering. He was trying to discern what he was saying was difficult. He was also using a lot of nonverbal gestures as the source testified at trial. So those things in combination made it difficult. But there were multiple times where there were in the record and in conversations thereafter where it was clear the defendant knew what that information was, the information that he had provided, and he had clearly indicated to the source that he knew that that was a real person, that it was not a fake. And, again, the source was saying, you know, my woman on the inside, the lady, the fictional lady from Chad, she needs to know that this is a real person and it's not a fake. And he confronted him a couple times about that, and the defendant every time was consistent in saying it's not a fake, it's a real person. So the evidence was really overwhelming, and clearly the jury credited both what the source had testified to and the references and the recordings after that. And so the jury's verdict shouldn't be disturbed on the aggravated identity theft count. So I'd ask this Court to deny the appeal on all grounds. Thank you. Thank you. Mr. Marra, Mr. Awadi, you have additional time. I accept that the Court has additional questions for me, but I do believe that the record doesn't support the conviction with respect to the bank fraud. Judge Davis, with respect to the question that you asked, the specific grounds under which the Court made its finding with respect to the sophisticated means is not what the government is now saying that this Court should look at in terms of sustaining the sophisticated means. The judge specifically stated the basis upon which he found sophisticated means, and as you alluded, there's nothing sophisticated about this scheme. But am I correct? You don't dispute that the other evidence that the government alludes to is in the record? Oh, it's in the record. It's in the record. It's in the record. Okay. But then the problem with the evidence that they allude to is, one, there's nothing on the term drive that indicates or shows that any of these checks came from the term drive or was produced by the government. The government concedes that. Yes. And then, number two, there's nothing about this employee identification number that it came from the term drive. Basically, what they have at the term drive that has different documents as to who has it, how it was produced, we don't know. If you look at the entire record, specifically the conversation, the purpose of using a confidential informant and having a recording of conversations that take place is for us to have no doubts as to what the path is discussed. There's nothing. May I ask you this? Yes. So imagine a case in which one co-schemer uses sophisticated means who is aided and abetted by a co-schemer who perhaps doesn't have the same level of expertise. Does the sophisticated means enhancement apply to both defendants or only the one who actually washed the checks on the computer and the scanner? Very interesting question. Thank you. Thinking of my field, Judge Davis, I believe that each defendant or each individual should be treated differently. Not surprised by your answer. Because if you look at the circumstances, each individual is different. For example, if somebody was to tell a particular defendant in a co-conspiracy case, for example, I want you to stand in front of the bank and then make sure that when you see the police, you come and tell me. Or in a drug situation where individuals are amused as opposed to the people who are. But that hurts you, doesn't it? Because even the getaway driver is on the hook for everything that happens in the bank, right? But then the court has to, in fashioning an appropriate sentence post-booker, still has to provide or give an individualized sentence to a particular defendant. And if you use that analysis in this case, there's nothing in the record that shows that this man, Mr. Adepoju, produced these checks. But he was in possession of the thumb drive. He was in possession of the thumb drive. But as the government concedes, there's nothing in the thumb drive that shows that these checks ever came from that thumb drive or that he produced it. But he had the thumb drive. He had the thumb drive. But there's no evidence in the thumb drive that was linked to either the TA information or the employer identification number or any of the two checks, the $78,000 or the $28,000. $78,000 and $28,000, none. All they have is a thumb drive that has information in it, but then nothing linked to the particular alleged scheme in this particular case. So in looking at the individuals, you have to look at them differently because one individual's participation, one may be an either and a better but then equally responsible as the principal. And in determining sophisticated means, I do not believe that all the defendants should be treated equally in terms of sophistication. But in this case, as the government concedes, they set it up. The way they set it up is to get specific crime and to get specific elements. But there's nothing that was done by Mr. Adepoju that crosses that line that meets all the elements of the bank fraud alleged and indictment and with respect to the aggravated identity fraud, the employer identification number. Yes, it says any means of identification, but then the question is that we don't have anything in the record that he knew that this identity was that of a living person except a cooperator who was wearing a wire. We didn't hear it through the whole wire, and his story is that we have the conversation, but it's not recorded. Thank you, Your Honor, for your time and attention. Thank you so much. Mr. Orlanje, I note and we note that you are a court opponent. We want to give you a special thanks for taking on these cases that we couldn't do our work without your help, and we really appreciate that. Thank you, Your Honor. Mr. Mohawk, of course, you're ably represented in the government. We thank you as well. We'll come down to Greek Council, then proceed to our final hearing.
judges: Henry F. Floyd, Andre M. Davis, Max O. Cogburn